UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KEVIN WEBB, individually and as the representative of the Estate of Robert Allen Webb, and EDNA WEBB, and CASEY AKINS, individually as heirs at law | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § | CIVIL ACTION NO. 3:13-cv-218 |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, ROBERT EASON and TOMMIE HAYNES, in their individual capacities, the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and the UNIVERSITY OF TEXAS MEDICAL BRANCH. | § § § § § § § § | JURY DEMANDED |
| DEFENDANTS | § | |

## COMPLAINT

Robert Allen Webb died in Texas Department of Criminal Justice custody because Defendants, Texas corrections officials, fail to protect prisoners from dying from heat stroke in the brutally hot TDCJ Hodge Unit. Mr. Webb's survivors seek redress for their relative who perished at the Hodge Unit.

### STATEMENT OF CLAIMS

1.      Prisoners are dying of heat stroke while in Defendants' custody at prisons across Texas. The survivors of one of these men, Robert Allen Webb, bring claims as heirs-at-law, and as statutory wrongful death beneficiaries against Defendants for taking Allen's life.

2.      The Plaintiffs claim the individual defendants are liable for damages for violating Allen's constitutional rights under color of law, in violation of his Eighth and Fourteenth Amendment right to protection from cruel and unusual punishment under 42 U.S.C. §1983. Further the plaintiffs claim TDCJ and UTMB caused Allen's death by failing to provide

1

reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as Defendant UTMB resides in this district, and all Defendants reside in this state.

PARTIES

5.     Plaintiff Kevin Webb, Mr. Webb's natural son, sues in his individual capacity as a statutory beneficiary under the Texas Wrongful Death Act and as representative of Mr. Webb's estate.  At the time of his death, Mr. Webb had three adult children (and no minor children).  He died intestate, and there were no probate proceedings arising from his death, as none were necessary.  Kevin Webb is a resident of Smith County, Texas.

6.     Casey Akins is a surviving daughter of Mr. Webb, and sues in her individual capacity as statutory beneficiary of the Texas Wrongful Death Act and as heir-at-law of the Estate of Robert Allen Webb.  Ms. Akins resides in Polk County, Texas.

7.     Edna Webb is the mother of Mr. Webb, and sues in her individual capacity as a statutory beneficiary of the Texas Wrongful Death Act.  She is a resident of Harris County, Texas.

8.     Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ).  As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their

2

training, supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody.  At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, and compensatory damages.  He can be served with process at 209 W. 14th St., Austin, TX 78701.

9.     Defendant Tommie Haynes was the warden at the Hodge Unit at all relevant times. At all relevant times, Haynes was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief.  He can be served with process at 379 FM 2972, Rusk, Texas 75785.

10.   Defendant Rick Thaler is the director of TDCJ's Correctional Institutions Division. The Correctional Institutions Division manages all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, Texas, in Walker County.  He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

11.   Defendant William Stephens is the deputy director of TDCJ's Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all

relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, Texas, in Walker County. He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

12. Defendant Robert Eason was the regional director for TDCJ's "Region II," and supervises eleven prisons, including the Hodge Unit. As the regional director, he is responsible for the supervision of all personnel at the Hodge Unit. Eason was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason is a resident of Anderson County, Texas.

13. The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Gurney Transfer Facility, a public facility with programs and services the deceased and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, compensatory, and nominal relief. It can be served with process by serving Brad Livingston, its executive director, at 861 B IH 45 North, Huntsville, TX 77320.

14. The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Gurney Unit. UTMB is a recipient of federal funds. UTMB is sued for compensatory relief. It can be served with process by serving its president, David L. Callender, at 301 University Blvd., Suite 6.100, Administration Building, Galveston., TX 77555-1006.

4

## FACTS

**Extreme Temperatures are Killing Texas Prisoners**

15. According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Robert Allen Webb, died at TDCJ's brutally hot Hodge Unit.

16. The Hodge Unit's inmate living areas are not air conditioned, and heat index or apparent indoor temperatures (see chart below) routinely exceed 100 degrees.

17. These temperatures last late into the night, providing no relief to TDCJ's prisoners. Even early in the morning, indoor apparent temperatures are very high.

18. Temperatures this high cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

19. TDCJ and UTMB incorporate this chart, promulgated by the National Oceanic and Atmospheric Administration (NOAA), into agency policies.



**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

Caution    Extreme Caution    Danger    Extreme Danger

20. The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

21. The indoor apparent temperatures routinely reach the red "extreme danger" zones indoors at the Hodge Unit. According to NOAA, when the apparent temperature reaches "extreme danger" heat stroke is "imminent."

22. People with certain medical conditions, like diabetes or hypertension, or who take certain medications, like psychotropics or diuretics, are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death.

23.     Since 2007, thirteen men have died in TDCJ prisons from heat-related causes.

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |

24.     In fact, it is likely that there were more heat related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists.

25.     These men all shared certain characteristics. Most took psychotropic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension.

7

Many arrived in non-air-conditioned TDCJ facilities shortly before their deaths – they were not acclimated to the heat, and/or had not received initial physicals. Most collapsed in the middle of the night, or were found dead early in the morning. And they all died in late July and early August – the hottest days of the Texas summer.

26.     Eight of these men, including Robert, lived in prisons in TDCJ's "Region II" – where Defendant Eason is the regional director. As the regional director, Eason reviews reports on each prisoner's death.

27.     Even though ten men died of heat stroke in 2011 – and eight of them died in his "region" – Eason did not consider these deaths a serious problem. In fact, in the face of these deaths, he believed TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, he and Defendant Haynes took no action to protect future prisoners, like Allen, in the face of TDCJ's obviously inadequate procedures.

28.     Eason's direct supervisors, Defendants Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke were regularly discussed at meetings Thaler and Stephens held with their deputies, including Eason. As the existing policies became obviously inadequate, Thaler, Stephens and Eason continued to follow the same deadly course of conduct. Air conditioning the Gurney Unit or other prisons was never even discussed.

29.     For TDCJ to make a necessary capital improvement like air conditioning the prisons, action by the most senior TDCJ officials, including Defendant Livingston, would be needed. Despite prisoners continuing to die from extreme temperatures, Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

30.     These hazardous conditions serve no penological purpose.

**TDCJ Denied Allen Safe Housing**

31.     Air-conditioned housing is available at some other TDCJ prisons. Of the 97 state operated TDCJ prisons, 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells (including death row) are routinely air conditioned. While inhumane heat conditions are never justified, it is ironic that prisoners who obediently serve their time do not receive relief from the extreme heat, while prisoners who are allegedly combative, assault staff, or are sentenced to death live in safe conditions.

32.     Of course, areas like Livingston, Eason, Stephens, Thaler, and Haynes's offices are air conditioned – a comfortable 75 degrees. TDCJ even air conditions the armory at the prison because of concerns the prison's weapons could be damaged by the heat

33.     TDCJ and UTMB policies only provide protections from heat to inmates performing outdoor prison labor. If a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." The policy, however, makes *no* accommodations for prisoners' housing assignments, or locations they are required to live in, even though temperatures in living areas routinely reaches the "extreme danger" zone. TDCJ and UTMB policy only addresses preventing heat-related injuries "in the workplace."

34.     UTMB makes mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk. But UTMB and TDCJ policies do not contemplate special housing for prisoners with heat-sensitive disabilities.

35.     Significantly, Defendants chose not to provide prisoners at the Hodge Unit, including Allen, opportunities to cool off in an air conditioned environment. Though some parts

of the Hodge Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners are not given a chance to cool off.

36.     Eason considers adding any air conditioning to TDCJ's prisons a waste of money.

**People with Certain Medical Conditions are Especially Vulnerable to Extreme Temperatures**

37.     TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

38.     TDCJ and UTMB policies list certain medical conditions that "may affect heat tolerance." These conditions include: cardiovascular disease, and psychiatric conditions.

39.     TDCJ advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics and psychotropics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhuman conditions, prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death.

40.     Unfortunately, many TDCJ inmates suffer from these conditions, including Allen and the other men who died.

**Correctional Officers at the Hodge Unit are Inadequately Trained**

41.     Because the apparent temperatures are so high, it is imperative TDCJ's low-level employees recognize heat-related illnesses and get prisoners emergency medical care. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A training circular is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated after Mr. Shriver and Mr. Robles died in 2007.

42.     UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

43.     As the warden and regional director, Haynes and Eason are directly responsible for training the front-line officers charged with protecting prisoners lives.

**When Men Died in 2007, TDCJ and UTMB Failed to Make Changes**

44.     Two TDCJ and UTMB victims died at TDCJ's Byrd Unit in 2007. The first prisoner to die, James Shriver, arrived at the Byrd Unit less than 24 hours before his death. Though he had served several years in prison, he came to Byrd on the afternoon of August 7, 2007 from a TDCJ inpatient, mental-health facility that was air conditioned. That day the apparent temperature reached 105 degrees. Shortly before 5:00 am the next day, officers found him dead in his cell.

45.     Less than a week later, Dionicio Robles died of heat stroke at the Byrd Unit. He also came to the Byrd Unit from a TDCJ inpatient mental health facility that was air conditioned. He arrived at the Byrd Unit on August 3, 2007, and was dead less than ten days later. The day he died the apparent temperature topped 106 degrees. He was also found dead in his cell shortly before 5:00 am.

46.     Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

47.     Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Thaler and Stephens. But even though two men died

under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future.

**As Men Died in 2011, TDCJ and UTMB Failed to Make Changes**

48.     The first TDCJ prisoner to die from heat stroke in 2011 was Larry Eugene McCollum. He was found unresponsive in his bunk at the Hutchins Unit, a TDCJ transfer facility Eason supervises, on July 22, 2011. He was hospitalized in Dallas until life-support was withdrawn on July 28, 2011.

49.     Shortly after Mr. McCollum's heat stroke, Douglas Hudson was found unconscious, having a seizure in his cell at the Gurney Unit on July 24, 2011. He received medical attention at the prison, and his body temperature was 105 degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, but died of heat stroke on July 25, 2011. The Gurney Unit is one of the prisons Eason supervises.

50.     A few days later, on August 3, 2011, Thomas Meyers died at the Coffield Unit after suffering a heat stroke. Serving time for a burglary, Mr. Meyer's body temperature was 105.6 degrees when he received medical attention. The Coffield Unit is also within Eason's supervision region.

51.     The next day, Allen died at the Hodge Unit.

**TDCJ Officials at the Highest Levels Knew About these Deadly Conditions**

52.     Livingston, Thaler, Stephens, Eason, Haynes, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed to take reasonable steps to protect the health and safety of prisoners.

53.     And Livingston, Thaler, Stephens, Eason, and Haynes all knew inmate living areas at the Gurney Unit were not air conditioned, and that the apparent temperatures routinely skyrocketed during the hot Texas summers.

54.     At all relevant times, Livingston, Thaler, Stephens, Eason, and Haynes knew that extreme temperatures can be deadly.

55.     Livingston, Thaler, Stephens, Eason, and Haynes, as well as TDCJ and UTMB, also knew TDCJ routinely housed people with hypertension, diabetes, and mental illness in extremely hot facilities like the Hodge Unit. Moreover, TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, and Haynes knew about, make no accommodation for people with mental illnesses during periods of extreme temperatures.

56.     Eason and Haynes worked at the Hodge Unit, or in nearby Tennessee Colony, every day, and knew about the extreme temperatures the area experiences each summer.

57.     Though Livingston, Thaler and Stephens works in Austin and Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months.

58.     Instead of having a formal policy, TDCJ relies on an informal email to protect prisoners from the extreme temperatures indoors. Stephens and Thaler send the email in May of each year to remind wardens and regional directors to begin to take heat-safety precautions. But even this email does not provide for any way to protect a prisoner with heat-sensitive medical conditions from extreme temperatures. Instead, it relies on measures the 2007 deaths proved to be inadequate, like increasing water intake and providing additional fans.

59.     The email is recycled each year – the text is virtually identical, and has not changed even after men began to die. Thaler and Stephens know the measures described in the email are inadequate, but have taken no action to improve TDCJ's response to heat-related emergencies.

60.     High-level TDCJ officials have been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners

13

were dying of heat-related causes as far back as 1999. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

61.     Among other lawsuits, Livingston was a named defendant in *Blackmon v. Kukua*. In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at Mr. Blackmon's prison] are not air conditioned." Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit. *Blackmon* went to trial in February 2011, just a few months before Allen died at the Gurney Unit.

62.     High-ranking UTMB officials were dismissive of the *Blackmon* suit. Dr. Charles Adams, a chief UTMB physician, testified the extreme temperatures did not violate Mr. Blackmon's rights, flippantly saying "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away."

63.     As the conditions at the Hodge Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Allen, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled by air conditioning, or to make sure inmates with serious mental illnesses were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat. A decision, of course, they made from the comfort of their own air conditioned offices.

64.     TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Eason and Haynes routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison.

14

65.     UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, and Haynes – at a minimum – failed to take reasonable steps to safely house prisoners at the Hodge Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Eason, and Haynes were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

66.     Meaningfully addressing these conditions would require action at the highest levels of the agency, including authorization and approval from Livingston and Thaler.  They have refused to act, authorize or otherwise approve actions to address these conditions.

67.     At the time of Allen's death, the law was clearly established that temperatures exceeding 90° are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Thaler, Stephens, Eason, and Haynes are not entitled to qualified immunity.

68.     Plainly, the conditions at the Hodge Unit result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Allen, as well as the prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest.

**Allen was Disabled**

69.     Allen suffered from severe mental illnesses. In high school, he was diagnosed as suffering from bipolar disorder.

70.     Allen only completed the ninth grade, and was enrolled in special education classes for most of his time in school. He had trouble concentrating, even when he tried to take GED classes in TDCJ. Because of his disabilities, he always had difficulty reading and writing.

71.     Despite his disabilities, Allen held regular jobs as a truck driver, and working in the oil fields.

72.     But his life began to fall apart when his father died. Allen was very close to his dad. His disabilities caught up to him. Before going to prison, Allen spent time homeless, living on the streets. He reported hearing voices, most often of his father.

73.     When he arrived in TDCJ custody, UTMB doctors diagnosed him with "adjustment disorder with mixed anxiety and depression" and prescribed Thorazine (chlorpromazine), Celexa (citalopram), and Omeprazole. UTMB found he had "borderline intellectual functioning," and he needed help completing simple tasks, like making a short voice-recording so he could access the TDCJ prison payphone system.

74.     Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

75.     As a result of his mental illnesses, TDCJ and UTMB enrolled him in the "Mentally Retarded Offender Program" (MROP), and housed him with other prisoners with developmental disabilities at the Hodge Unit in Rusk, Texas.

76.     Allen also suffered from Hepatitis C, and received treatment from UTMB for the disease while in TDCJ custody.

77.     Thorazine is known to affect thermoregulation – the body's ability to cool itself. Thorazine is an antipsychotic, or psychotropic drug, which TDCJ and UTMB recognize puts prisoners like Allen at heightened risk of heat-related injury.

78.     TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason and Haynes, knew prisoners with depression and taking powerful psychotropic drugs lived in Texas

prisons and were at risk for heat-related injury, yet refused to accommodate them during the extreme heat of the Texas summers.

79.     TDCJ and UTMB discriminated against Allen by denying him reasonable accommodations necessary to allow him access to TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people like Allen access to TDCJ facilities.

**Allen's Death**

80.     At the time of his death, Allen was a fifty year-old man. A native of the Houston area, he loved to fish and hunt with his family. He was a loving father who always attended his children's school and athletic events.

81.     Allen was convicted of non-aggravated robbery, and sentenced to serve time in TDCJ. He expected to be paroled April 2012.

82.     He spent several summers at the Hodge Unit. Each year, he suffered symptoms of heat exhaustion. In August 2009, he wrote a sick call, concerned he was "drinking a lot of water and I'm still dizzy, dehydrated, cramps and muscle spasms. I am having these symptoms all day, and all night. Please can you help me?" He wrote "I get dizzy, feel like I'm light headed, like I'm gonna faint" and "my eyes get blurry so could you please see me?" When he saw UTMB staff the next week, he told nurses "I'm very dehydrated (even though I'm drinking plenty of water). … I have these symptoms all day long." Dizziness, nausea, blurred vision, muscle cramps and dehydration are all symptoms of heat exhaustion.

83.     In August 2010, he reported suffering "diarrhea, dizziness and nausea" to UTMB medical providers. Nurses noted his skin was warm to the touch, and he complained of dehydration and dry mouth. Though he was again suffering from heat exhaustion, UTMB and TDCJ provided him no accommodations.

84.     In July 2011, shortly before his death, he again complained to UTMB medical staff he was having "dizzey" spells."

85.     In the month before Allen died, the Rusk area had endured 18 days where the temperature exceeded 100 degrees Fahrenheit. Temperatures soared as high as 107°.

86.     A few weeks before his death, Allen's brother, Sidney Webb, visited him at the Hodge Unit. During the visit, Allen drank several cold Cokes purchased from the vending

machine, and complained about the extreme heat in the cell blocks. Sidney thought Allen looked terrible – he appeared pail and gaunt. Sidney asked if he could buy cold Cokes from the prison commissary, and Allen responded "those Cokes are so hot they explode."

87.     Allen believed the heat would kill him – he talked with his brother about giving his property away and his impending death.

88.     He told his brother he'd been experiencing difficulty breathing recently, and had tried to go to the infirmary.

89.     In the weeks before he died, Allen made several visits to the prison infirmary, complaining about the heat, including on the day he died.

90.     Two days before his death, Allen made a desperate phone call to his mother. He complained "it's hot and I'm sick," and told her he was sleeping on the concrete floor to try and stay cool. He was "real depressed" and suffering in the sweltering temperatures.

91.     On the night of August 4, 2011, the Rusk area experienced temperatures near 90 degrees after midnight. That day, the heat in Rusk was sweltering – 105 degrees Fahrenheit, with 50 percent humidity. The heat index, the combination of temperature and humidity, made the air temperature feel like it was over 137 degrees. According to TDCJ's heat matrix, at these temperatures "heatstroke [is] imminent."

92.     Shortly after 3 am that night, Allen was found nude, laying on the floor of his cell and unresponsive. His skin was hot to the touch.

93.     Prison staff attempted CPR and applied a defibrillator, but it was too late. Allen was pronounced dead at 3:55 am.

94.     The autopsy noted when body temperatures reach the levels Allen experienced, "all cellular structures are destroyed and cellular necrosis occurs in less than 5 minutes." The pathologist noted Allen "had several risk factors for [heat stroke]: lack of air conditioning,

chronic illness, and use of Thorazine."

CAUSES OF ACTION

EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Eason and Haynes Only, in Their Individual Capacities)

95.     Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

96.     By subjecting Allen to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Eason and Haynes acted with deliberate indifference to the his serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

97.     The extreme temperatures Defendants tolerated at the Hodge Unit proximately caused Allen's untimely death.

98.     Plaintiffs bring these claims through 42 U.S.C. §1983.

AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT
AMENDMENT ACT AND REHABILITATION ACT
(As to Defendants TDCJ and UTMB Only)

99.     TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, services, programs, or activities and reasonably modify such facilities, services, programs or activities to accomplish this purpose. 29 U.S.C. §794.

100.    Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act.  42 U.S.C. §§12131 et seq..

20

101. Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperatures actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

102.    The Hodge Unit is a facility, and its operation comprises services, programs or activities of TDCJ and UTMB for Rehabilitation Act, ADA, and ADAAA purposes. Allen was otherwise qualified to receive the services of and participate in the programs or activities provided by TDCJ and/or UTMB at the Hodge Unit.

103.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Allen was a qualified individual regarded as having a physiological or mental impairment that substantially limited one or more of his major life activities. Defendants TDCJ and UTMB knew Allen suffered from mental illnesses, and was prescribed medications to treat his disabilities. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and refusing to accommodate his disabilities and protect him from the extreme temperatures that took his life.

104.    As alleged above and herein, TDCJ and UTMB failed and refused to reasonably accommodate Allen, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

105.    As alleged above, TDCJ and/or UTMB failed and refused to reasonably modify its policies, practices or procedures to ensure Allen access to the facilities, services, programs or activities of the Hodge Unit by reasonably accommodating hisAllen disabilities. These failures and refusals caused his death.

106.    Allen died as a direct result of TDCJ's intentional discrimination. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

DAMAGES

107.     Allen's survivors are entitled to compensatory, punitive, presumed, and nominal damages against the individual Defendants in the maximum amounts allowed by law.

108.     Allen's survivors are entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by law.

109.     As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of Allen's wrongful death, Plaintiffs assert claims under the United States Constitution and 42 U.S.C. §1983, the ADA, ADAAA, and Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

110.     More particularly, Plaintiffs Kevin Webb, and Casey Akins, in their capacities as heirs-at-law to the Estate of Robert Allen Webb, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish;

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act or as allowed by law.

110.     Plaintiffs Kevin Webb, Casey Akins, and Edna Webb, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Robert Allen Webb; and,

22

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

ATTORNEYS' FEES AND COSTS

111.    Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also requests attorneys' fees, costs, and expenses against TDCJ for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a.

PRAYER FOR RELIEF

THEREFORE, Plaintiffs requests that the Court:

A.    Award compensatory damages, nominal and presumed damages against Defendants to the survivor plaintiffs;

B.    Award punitive damages against the individual Defendants only under Section 1983 and the Wrongful Death Act, and through the Survival Statute to the survivor plaintiffs;

C.    Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.    Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: May 29, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
 Tel.   512-623-7727
 Fax.  512-623-7729


By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

ATTORNEYS FOR PLAINTIFFS

Respectfully Submitted,

 /s/Scott Medlock
Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS