| | | |
|---|---|---|
| ASHLEY ADAMS, et al., | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-03326 |
| BRAD LIVINGSTON, individually and in his official | § | |
| capacity, JOE OLIVER, NANCY BETTS, STEVEN | § | CONSOLIDATED WITH |
| FIELDS, JOHN DOE, ROBERT LEONARD, | § | |
| BRANDON MATTHEWS, DEBRA GILMORE, | § | *Togonidze v. Livingston*, |
| SARAH RAINES, DANNY WASHINGTON, | § | 4:14-cv-03324 |
| MATTHEW SEDA, TULLY FLOWERS, DORIS | § | |
| EDWARDS, LINDA McKNIGHT, REVOYDA DODD, | § | *Webb v. Livingston*, |
| RICK THALER, WILLIAM STEPHENS, ROBERT | § | 4:14-cv-03302 |
| EASON, DENNIS MILLER, REGINALD GOINGS, | § | |
| LANNETTE LINTHICUM, JENNIFER BUSKIRK, and | § | JURY DEMANDED |
| OWEN MURRAY in their individual capacities, TEXAS | § | |
| DEPARTMENT OF CRIMINAL JUSTICE, and | § | |
| UNIVERSITY OF TEXAS MEDICAL BRANCH | § | |
| | § | |
| DEFENDANTS | § | |

## MOTION FOR SANCTIONS AGAINST DEFENDANTS REGINALD GOINGS, DENNIS MILLER, AND THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Defendants TDCJ and Goings shredded clearly relevant documents well after TDCJ, Miller, and Goings, knew they were obligated to preserve this evidence. Very important documents were destroyed and cannot be recovered. Thus, Plaintiffs respectfully move the court to enter termination sanctions as to TDCJ, Miller, and Goings because the abuse is severe, damaging to the Plaintiffs, and part of a pattern of discovery abuse by the Texas Department of Criminal Justice in the prison heatstroke death litigation.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iii

I.   ISSUES TO BE RULED UPON BY THE COURT ...............................................1

II.  NATURE AND STAGE OF THE PROCEEDING ..............................................3

  A.   Procedural History & Factual Background .................................................3

  B.   The Documents that Defendants TDCJ and Goings Destroyed ...........................15

III. ARGUMENT – DESTRUCTION OF DOCUMENTS WARRANTS SANCTIONS ...............22

  A.   Standard of Review ...................................................................22

  B.   Defendants had a Duty to Preserve the Destroyed Documents ...........................22

  C.   Defendants Knew the Destroyed Documents were Relevant ...............................26

  D.   Destruction of these Documents Prejudices Plaintiffs. ...............................28

  E.   Appropriate Sanctions Include Entry of Judgment Against TDCJ, Miller, and Goings, TDCJ's Indemnification of All Other Defendants, a Spoliation Instruction, and Attorneys' Fees and Expenses. .................................................................30

IV.  CONCLUSION ...........................................................................37

**Cases**

*Apple, Inc. v. Samsung Elec. Co. Ltd.*,
   888 F.Supp.2d 976 (N.D. Cal. 2012) ...................................................... 38

*Bayoil, S.A. v. Polembros Shipping, Ltd.*,
   196 F.R.D. 479 (S.D. Tex. 2000) .......................................................... 23

*Bratka v. Anheuser-Busch, Inc.*,
   164 F.R.D. 448 (S.D. Ohio Dec. 11, 1995) ....................................... 34, 37

*Brown v. Tellermate Hold. Ltd.*,
   No. 2:11-cv-1122, 2014 WL 2987051 (S.D. Ohio, July 1, 2014) ........................ 29

*Chapman & Cole v. Itel Container International B.V.*,
   865 F.2d 676 (5th Cir. 1989) .............................................................. 25

*Clearvalue, Inc. v. Pearl River Polymers, Inc.*,
   242 F.R.D. 362 (E.D. Tex. 2007) .......................................................... 24

*Emerick v. Fenick Indus., Inc.*,
   539 F.2d 1379 (5th Cir. 1976) ............................................................ 34

*Frost v. Ft. Worth Indep. Sch. Dist.*,
   5 F.3d 1495 (5th Cir. 1993) .............................................................. 33

*Holden v. Illinois Tool Works*,
   429 F.Appx. 448 (5th Cir. 2011) .......................................................... 24

*Laukus v. Rio Brands, Inc.*,
   292 F.R.D. 485 (N.D. Ohio, Mar. 11, 2013) ................................................ 34

*Managed Care Sol'ns Inc. v. Essent Healthcare*,
   736 F.Supp.2d 1317 (S.D. Fla. 2010) ..................................................... 36

*Mercury Air Group, Inc. v. Mansour*,
   237 F.3d 542 (5th Cir. 2001). ............................................................ 24

*Moore v. CITGO Ref. & Chem. Co.*,
   735 F.3d 309 (5th Cir. 2013) ........................................................ 30, 33, 35

*Mosaid Tech., Inc. v. Samsung Elec. Co.*,
   348 F.Supp.2d 332 (D. N.J. 2004) ........................................................ 30

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
    115 F.R.D. 543 (N.D. Cal. 1987) ........................................................................ 24

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
    427 U.S. 639 (1976) ........................................................................................... 33

*Nissho-Iwai American Corp. v. Kline*,
    845 F.2d 1300 (5th Cir. 1988) ............................................................................. 34

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,*
    685 F.Supp.2d 456 (S.D. N.Y. 2010) .................................................................. 23

*Quantlab Techs. Ltd. (BGI) v. Godlevsky*,
    No. 4:09-CV-4039, 2014 WL 651944 (S.D. Tex. Feb. 19, 2014) ................ passim

*R & R Sails Inc. v. Insurance Co. of State of PA*,
    251 F.R.D. 520 (S.D. Cal. 2008) ........................................................................ 24

*In re Byrd, Inc.*,
    927 F.2d 1135, 1137 (10th Cir. 1991) ................................................................ 25

*VirnetX Inc. v. Cisco Systems, Inc.*,
    No. 6:10–CV–417, 2012 WL 7997962 (E.D. Tex. August 8, 2012) ................... 31

*Woodson v. Surgitek, Inc.*, 57 F.3d 1406 (5th Cir. 1995) ............................................... 33

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................... 24

Fed. R. Civ. P. 37 ........................................................................................................... 23

# I. ISSUES TO BE RULED UPON BY THE COURT

On the even of the *Adams* discovery deadline, Defendants revealed that, during 2014—well after this litigation was filed—a TDCJ risk manager, with Defendant Warden Goings' approval, destroyed relevant documents created at the Gurney Unit during the summers of 2011 and 2012. The documents included inmate complaints, summary reports of heat-related illnesses, and inspection logs of dormitories. These documents are near essential for Plaintiffs, the Court, and ultimately the jury to weigh the adequacy of the alleged "mitigation measures" TDCJ, Warden Miller, and Goings purportedly implemented at the Gurney Unit in 2011 and 2012. They also go to Wardens Miller and Goings' subjective knowledge of the risk to prisoners in their custody, and the adequacy of the measures actually in place at the prison they supervised. These are core elements of Plaintiffs' claims.

TDCJ, Miller, Goings, and their attorneys (as well as the executive level defendants)[1] should have anticipated and prevented the destruction of this evidence for years, including more than one year while this case was pending, but failed to do so.

Nor is this TDCJ and its attorneys' first offense in the prison heatstroke litigation[2]—TDCJ has already been sanctioned more than $100,000 for withholding tens of thousands of pages of responsive documents in the related *McCollum* matter after

---

[1] Including Rick Thaler, William Stephens, Robert Eason, Brad Livingston, and Lannette Linthicum.

[2] Nor, sadly, is it the last. TDCJ also produced an exceptionally relevant, previously undisclosed, letter from local physicians to high-ranking TDCJ executives expressing the doctors' concerns about prisoners' dying of heatstroke at the Gurney Unit. *See* Ex. 1. Plaintiffs only received this letter on December 7, 2017, and expect separate relief will be needed as a result. Thousands more documents, stretching back decades, were produced for the first time on December 11, 2017.

failing to even look for key evidence for years. Instead, TDCJ and its lawyers' cavalier disregard for the rules of discovery caused significant additional spoliation. While the threat of sanctions loomed in *McCollum* and had already acknowledged wrongdoing, TDCJ destroyed vital documents at the Gurney Unit. TDCJ even continued destroying documents at the Gurney Unit after the Northern District of Texas actually sanctioned the agency. *McCollum v. Livingston*, No. 3:12-cv-02037-L, Doc. 219 (N.D. Tex. Jan. 26, 2015).[4]

Just as shocking, Defendants and their lawyers concealed the destruction of this evidence until the waning days of the discovery period in this case, while Plaintiffs were deposing witnesses who would certainly have been asked to testify about the documents' contents and their unjustified destruction. For at least two months, the Office of the Attorney General knew the documents had been destroyed, but, instead of informing Plaintiffs' counsel, the Office of the Attorney General intentionally allowed Plaintiffs' attorneys to proceed in the dark. Nine depositions were taken between when the Attorney General allegedly first learned about the destroyed documents, and when Plaintiffs' counsel were finally informed.

At this point, because there is no dispute the documents were destroyed and cannot be recovered, it is impossible to wholly cure the prejudice to the Plaintiffs. All the Court can do is issue appropriate sanctions to mitigate this prejudice.

Because the documents destroyed were essential, and because this is not TDCJ's (and its attorneys) first offense, Plaintiffs are entitled to attorneys' fees and expenses, and

---

[4] *McCollum* was originally filed in the Northern District of Texas, then, with agreement of the parties, transferred to this Court. The Northern District retained the sanctions motion when the rest of the case was transferred.

entry of judgment against TDCJ, Goings, and Miller, the parties who benefitted the most from the document destruction and could have prevented it with reasonable diligence.

## II.    NATURE AND STAGE OF THE PROCEEDING

### A.    Procedural History & Factual Background

This case arises from three entirely preventable heatstroke deaths at the TDCJ Gurney Transfer Facility, an un-air-conditioned prison. Douglas Hudson, Kenneth James, and Rodney Adams, whose families bring this lawsuit, died after suffering heatstrokes at the Gurney Unit in July 2011, August 2011, and August 2012 (respectively). *See* Doc. 232. TDCJ acknowledges eight other men died of heatstroke inside its prisons in 2011.

Even before suit was filed, TDCJ and its employees reasonably should have known litigation was likely, and that they were obliged to preserve documents. In 2011, shortly after James' death, TDCJ and Warden Miller disciplined four officers who failed to provide him timely medical care.[5]

TDCJ executives then sent emails in September 2011 about the deaths that the agency now claims are privileged due to "anticipation of litigation."[6] That winter, TDCJ executives received a letter from local doctors concerned about the numerous heat-related deaths in East Texas prisons.[7]

---

[5] Ex. 37, Appx. 252.

[6] *See* Ex. 21, TDCJ Privilege Log Excerpt, Appx. 167 (asserting a "privilege" of "anticipation of litigation" for a September 9, 2011 email from Dr. Robert Williams, Deputy Director of TDCJ Health Services entitled "Re: possible heat-related illnesses and deaths").

[7] Ex. 1, Email from W. Stephens to L. Linthicum, re: "Palestine Regional Medical Center Letter" (Dec. 14, 2011), Appx. 1.

In April 2012, Plaintiffs' counsel requested public documents including "all internal memorandum or other documents circulated to TDCJ staff at the [Gurney Unit] related to temperature, heat, or heat index between May 1, 2011 and October 1, 2011" pursuant to the Texas Public Information Act. (*See* TEX. GOV'T CODE Chp. 552).[8] The prison's risk manager and document custodian at the time, Gary Missildine, testified he knew he was obligated to preserve documents once TDCJ received the request.[9]

In June 26, 2012, the *McCollum* plaintiffs filed their lawsuit. *McCollum v. Livingston*, No. 3:12-cv-02037 (N.D. Tex.), Doc. 1. TDCJ and UTMB executives immediately recognized this lawsuit was pertinent to many other deaths and pressed UTMB pathologists to finalize autopsies that same day.[10] The *McCollum* plaintiffs made initial discovery requests in November 2012, including an interrogatory asking TDCJ to "Identify all heat-related injuries … to inmates in [TDCJ] facilities between January 1, 1990 to the present," and sent an accompanying request for production requesting documents that "formed the basis" for the interrogatory response.[11]

At the time of the public information request and the filing of *McCollum*, Defendant Miller was the Gurney Unit's warden. Miller retired effective August 1, 2012, and Goings became the warden.[12] Rodney Adams died of heatstroke on August 3, 2012.[13]

---

[8] Ex. 8, Appx. 49.

[9] Ex. 49, Deposition of G. Missildine, pp. 29:15–24, 62:20–24, Appx. 467, 494.

[10] Ex. 3, Email from O. Murray to J. Aronson, re: "Heat Related Deaths" (June 26, 2012), Appx. 7; Ex. 4, Email from O. Murray to J. Aronson, re: "Autopsy Report Needed" (June 27, 2012), Appx. 14.

[11] *See* Ex. 7, *McCollum* Discovery Requests, pp. 8, 10, Appx. 41–42.

[12] Ex. 48, Deposition of T. Miller, p. 9:3–6, Appx. 444; Ex. 47, Deposition of R. Goings, p. 91:1–3, Appx. 434.

Plaintiffs' counsel served a notice of claim letter related Adams' death (pursuant to the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code Chp. 101.101) on February 1, 2013. The notice of claim letter specified the Gurney Unit was "dangerously hot" and that "[p]rior to Mr. Adams' death … ten other prisoners died from these conditions, including an inmate [named] Kenneth James, who died from extreme heat at the Gurney Unit."[14]

This lawsuit was filed June 13, 2013. Doc. 1.

Five days later, on June 18, 2013, TDCJ sent a formulaic notice to retain to Goings that identified the three decedents as heat-related deaths, specified certain documents to retain, and generally warned, "Do not destroy any files, requested or not, related to this cause of action, until resolution of said action," and cautioned "destruction of these records … **could result in serious consequences to the agency**."[15] While Missildine received this notice, no attorney ever contacted him about his obligation to preserve or collect documents, or what documents might be under his control as the prison's risk manager.[16]

On July 8, 2013, TDCJ sent Goings another email that specified further records to retain. The notice specifically cautioned Goings to maintain "grievance records to do with heat," "training on heat," and "efforts to get water to [prisoners]," and warned

---

[13] Ex. 6, Autopsy report of R. Adams, Appx. 22.

[14] Ex. 8, Appx. 49.

[15] Ex. 11, Email from Cherie Miller, re: "Offender Death," Appx. 58 (June 18, 2013) (emphasis added).

[16] Ex. 49, Deposition of G. Missildine, pp. 37:1–9, 37:17–19, 40:4–10, 41:13–16, Appx. 472, 474–475.

"[p]lease alert anyone on your unit who may be in possession of these records to not destroy them."[17]

On September 30, 2013, Plaintiffs sent discovery requests to Defendants in the *Adams* case, including Goings and TDCJ. Plaintiffs' requests included specific requests, set out in full below, for any documents alerting Miller and Goings (among others) to heat injuries, documents showing inspections of the facility by the risk manager, documents showing the risk manager's investigation into heat injuries, and generally any documents relating to heat injuries (and the warden's knowledge of them) at the Gurney Unit.[18] Similar requests were made in each of the related wrongful death cases, including *McCollum* (in November 2012) and *Webb* (in September 2013).[19] Though the prison's risk managers were custodians of many responsive documents, lawyers from the Office of the Attorney General and TDCJ's Office of General Counsel never showed the risk managers these requests.[20] Lawyers never told the risk manager about TDCJ's ongoing duty to supplement discovery responses.[21]

---

[17] Ex. 12, Email from Lynn Burgess, re: "Notice to Retain Records on offender heat deaths" (July 8, 2013), Appx. 60.

[18] Ex. 13, Plaintiffs' First Set of Discovery to TDCJ, pp. 12–16, Appx. 63–67 (see requests 2, 4, 6, 8, 13, 16, 19, 28, 30 and 32).

[19] Ex. 7, Appx. 35.

[20] Ex. 46, Deposition of T. Gillam, p. 238, Appx. 419.

[21] Ex. 46, Deposition of T. Gillam, pp. 145–46, Appx. 391–392. In light of the prior pattern of discovery abuse, this reflects, at best, gross incompetence from the Office of Attorney General and Office of the General Counsel.

In December 2013, TDCJ "responded" to the requests for production in this case by directing Plaintiffs to the agency's *McCollum* production[22] and inviting Plaintiffs to "inspect" the documents (or by answering only with generic objections).[23]

Plaintiffs began specifically seeking discovery from the risk managers at the various prisons where men died. In March 2014, the *McCollum* plaintiffs deposed the risk manager at the Hutchins Unit (where McCollum died).[24] Plaintiffs' counsel deposed the risk manager at the Michael Unit in May 2014.[25] Contemporaneously, the Plaintiffs in this lawsuit requested dates to depose the Gurney Unit's risk manager.[26] The risk managers at the prisons were obviously important witnesses—their jobs included "enter[ing] injury reports" and "conduct[ing] safety training.[27] But the risk manager at the prison never saw the discovery requests.[28] And no lawyer ever spoke with the Gurney Unit's risk manager about the request to depose him.[29] In fact, no lawyer ever met with

---

[22] Plaintiffs' counsel would soon learn this production was woefully deficient. *See infra* at pp. 12–13.

[23] Ex. 14, TDCJ's Responses to Plaintiffs' First Set of Discovery, pp. 13–18, Appx. 93–98.

[24] Ex. 51, Deposition of R. Storie, Appx. 590.

[25] Ex. 44, Deposition of M. Atchison, Appx. 305.

[26] Ex. 15, Email from S. Medlock (March 7, 2014), Appx. 136.

[27] Ex. 49, Deposition of G. Missildine, p. 11:14–24, Appx. 456.

[28] Ex. 49, Deposition of G. Missildine, p. 66, Appx. 498.

[29] Ex. 49, Deposition of G. Missildine, p. 79:19–24, Appx. 511; Ex. 46, Deposition of Gillam, p. 238, Appx. 419.

Missildine in person, until shortly before his December 4, 2017 deposition.[30] Missildine, who created the most relevant documents, testified "it would have been nice if we had some legal counsel" in responding to document requests and retention notices.[31] Before he retired in early 2014, Missildine knew these documents existed, needed to be preserved, and were important.[32]

On May 1, 2014, Plaintiffs notified defense counsel that it was apparent documents had not been searched for, and/or had been destroyed, in all the wrongful death cases (including this case and *McCollum*).[33]

On May 12, 2014, the McCollum family moved for discovery sanctions against the defendants, including TDCJ. *McCollum v. Livingston*, No. 3:12-cv-02037, Doc. 164 (N.D. Tex.). Generally, the *McCollum* plaintiffs contended TDCJ, its employees, and its attorneys failed to appropriately search for documents as required by the federal rules, and failed to "identify what potentially relevant documents might exist and begin any meaningful process of searching for those documents." *Id.*

In response to the *McCollum* motion, TDCJ did not "dispute … they have failed to meet [discovery] obligations" and "accept[ed] responsibility for these shortcomings." *Id.*, Doc. 183. TDCJ and its attorneys issued *mea culpas*, and described processes they

---

[30] Ex. 49, Deposition of G. Missildine, p. 91:15–20, Appx. 522.

[31] Ex. 49, Deposition of G. Missildine, p. 92:19–24, Appx. 523.

[32] Ex. 49, Deposition of G. Missildine, pp. 116:25–117:21, 126:7–16, Appx. 538, 548.

[33] Ex. 16, Letter from J. Edwards (May 1, 2014), Appx. 139.

were allegedly putting in place to prevent this from happening again.[34] But these processes were obviously not actually put into place.[35]

One week after the *McCollum* motion was filed, counsel for TDCJ sent another email to named Defendants, including Goings, instructing them to retain records related to the litigation. The TDCJ Office of General Counsel "wanted to remind everyone of your obligation to preserve records related to litigation" as "heat-related issues are back in the news."[36] This notice, however, focused only on "sav[ing] or archiv[ing] any email or mainframe correspondence" regarding heat, not paper documents, and was not sent to the risk managers.[37] Goings never shared this notice with the risk manager.[38]

Unbeknownst to Plaintiffs at the time, but according to defense counsel's current representations, during June of 2014, a new risk manager, Tod Gillam, began working at the Gurney Unit after Missildine retired.[39] Stunningly, Gillam never received any training about TDCJ's record retention practices, or his obligation to preserve documents.[40] Indeed, Gillam never received *any* formal training about record retention, even though he

---

[34] Ex. 18, Declaration of C. Milne, pp. 3–4, Appx. 146 (assistant general counsel for TDCJ); *McCollum*, Doc. 183.1 (N.D. Tex.) (assistant attorney general).

[35] *See also supra* n. 2 and Ex. 1.

[36] Ex. 17, Email from J. Marsh, Appx. 143 (May 19, 2014).

[37] *Id*.

[38] Ex. 49, Deposition of G. Missildine, p. 49:4–21, Appx. 482.

[39] Ex. 26, Letter from L. O'Leary (Aug. 4, 2017), Appx. 191; Ex. 46, Deposition of T. Gillam, p. 28, Appx. 333.

[40] Ex. 46, Deposition of T. Gillam, pp. 34, 76, Appx. 335, 365.

was the custodian of documents requested in litigation.[41] Missildine and Goings never spoke with Gillam about the previous record retention letters, or his obligation to preserve documents.[42] Neither did the lawyers. Thus, Gillam never received the previous litigation holds sent to the prison.[43]

Consequently, despite the pending sanctions motion in *McCollum* (in addition to Goings and TDCJ's other discovery obligations), TDCJ's acknowledgment of fault in *McCollum*, and representations made to the Court, Gillam began destroying relevant and responsive documents on October 14, 2014 with Goings' blessing.[44] Documents shredded included summaries of heat illnesses given to Miller and Goings, as well as notes from safety meetings—where precautions such as heat mitigation issues and training were discussed—from the relevant time periods.[45] These records went as far back as 2001.[46] No lawyer talked to Gillam before the document destruction began.[47] Gillam ultimately destroyed six boxes of documents, and forty floppy disks that likely contained discoverable evidence.[48]

---

[41] *See* Ex. 46, Deposition of T. Gillam, p. 200, Appx. 402.

[42] Ex. 46, Deposition of T. Gillam, pp. 29, 60, Appx. 334, 356.

[43] Ex. 46, Deposition of T. Gillam, pp. 96–98, Appx. 373–375.

[44] Ex. 19, Records Disposition Log (Oct. 14, 2014), Appx. 151.

[45] Ex. 19, Records Disposition Log (Oct. 14, 2014), Appx. 151; Ex. 49, Deposition of G. Missildine, pp. 102:19–103:13, Appx. 531–532.

[46] Ex. 46, Deposition of T. Gillam, p. 103, Appx. 376.

[47] Ex. 46, Deposition of T. Gillam, p. 73, Appx. 364.

[48] Ex. 46, Deposition of T. Gillam, p. 107, Appx. 377. Gillam never looked at the contents of the floppy disks, and concedes the data on them might have been "incredibly

Gillam finally received an email from the Brian Sears, TDCJ Assistant General Counsel, on October 29, 2014—after the lawsuit was pending over a year, and well after document destruction was under way.[49] But lawyers, including Sears, never even told Gillam what the litigation was about.[50] Sears never met with Gillam.[51] As a result, Gillam agreed "it would be difficult" for him to determine what documents he was destroying might be relevant.[52] The letter Gillam received from Sears only asked him to "search for any hard copy documents (emails, notes, spreadsheets, IOC's [sic], etc.)," and to "perform a search of your email accounts."[53] The notice did advise Gillam "**DO NOT DESTROY THESE RECORDS … REQUESTED OR NOT, RELATED TO THESE CAUSES OF ACTION … DESTRUCTION OF THESE RECORDS … COULD RESULT IN SERIOUS CONSEQUENCES TO THE AGENCY.**"[54] But, in

---

important." Ex. 46, Deposition of T. Gillam, p. 109, Appx. 378. Gillam testified he would not have destroyed potentially relevant documents if he had been informed about the litigation holds. *Id*. at pp. 122–123, Appx. 382–383.

[49] Ex. 20, Email from B. Sears (TDCJ Office of General Counsel), re: "Heat related litigation & Risk management" (Oct. 29, 2014), Appx. 164.

[50] Ex. 46, Deposition of T. Gillam, pp. 202–03, Appx. 403–404.

[51] Ex. 46, Deposition of T. Gillam, p. 260, Appx. 423.

[52] Lawyers never even told Gillam what the litigation was about. *Id*. at pp. 207–208, Appx. 406–407.

[53] Ex. 20, Email from B. Sears (TDCJ Office of General Counsel), re: "Heat related litigation & Risk management" (Oct. 29, 2014), Appx. 164.

[54] Ex. 29, Email from B. Sears (TDCJ Office of General Counsel), re: "Heat related litigation & Risk management" (Oct. 29, 2014), Appx. 164 (emphasis in original).

fact, Gillam never reviewed documents before destroying them, because he did not even know about the litigation or what the claims were because lawyers never told him.[55]

Despite receiving multiple preservation letters, Goings approved each destruction.[56] Goings had the opportunity to stop each destruction, but simply did not.[57] Gillam continued "g[etting] rid of documents based on the record retention schedule."[58] Goings never told Gillam about the litigation, or the obligation to preserve documents.[59]

In January 2015, the District Court for the Northern District of Texas granted the *McCollum* motion for sanctions. Judge Toliver found "it was unreasonable for the TDCJ Defendants and their counsel to not inquire further regarding whether there were any documents related to inmates' heat-related deaths or injuries," noting that, in fact, TDCJ maintained thousands of emails, reports, and other documentation of illnesses known to the highest levels of TDCJ's executive hierarchy. *McCollum v. Livingston*, No. 3:12-cv-02037-L (N.D. Tex.), Doc. 219, p. 19 (Toliver, Mag. J.); *id.*, Doc. 222 (affirming the Magistrate Judge's order) (Lindsay, J.). Judge Toliver found TDCJ's justifications for failing to search for and produce essential documents "border[s] on the ludicrous." *Id.* Though a "close call," Judge Toliver determined payment of attorneys' fees and discovery expenses was certainly an appropriate sanction, but mercifully deferred stiffer

---

[55] Ex. 46, Deposition of T. Gillam, pp. 223–25, Appx. 415–417.

[56] *Id.*; Ex. 46, Deposition of T. Gillam, pp. 51–54, Appx. 348–351.

[57] Ex. 46, Deposition of T. Gillam, p. 54, Appx. 351. Of course, as the Office of the Attorney General and TDCJ General Counsel hid this fact from Plaintiffs, Goings could not be questioned about this spoliation at his deposition.

[58] Ex. 46, Deposition of T. Gillam, p. 47, Appx. 344.

[59] Ex. 46, Deposition of T. Gillam, pp. 60, 67, Appx. 356, 360.

penalties "should Defendants choose a similar course of action in the future." Doc. 219, p. 24.

Eight months later, Gillam destroyed more responsive and relevant documents.[60]

While TDCJ and Goings' employees were busy destroying documents, discovery in this case was stayed. After consolidation with the related *Webb v. Livingston* and *Togonidze v. Livingston* cases, this Court stayed discovery over Plaintiffs' objections pending resolution of certain TDCJ Defendants' unsuccessful interlocutory appeals. Doc. 84; *Webb. v. Livingston*, No. 4:14-cv-03302, Doc. 154 & 165 (S.D. Tex.). The stay was not lifted until the resolution of a companion interlocutory appeal in *Hinojosa v. Livingston* on November 18, 2015 (and after several rounds of document destruction).

After the parties conducted the depositions of high-level TDCJ executives relevant to all the heatstroke wrongful death cases, this Court entered a scheduling order for this case and the related wrongful death cases on October 24, 2016, with discovery to close on May 22, 2017 (which was subsequently extended to July 3, 2017, and then again to August 30, 2017). Doc. 255; Doc. 269, Doc. 364. For several months after entry of the original discovery deadline, TDCJ refused to engage in discovery in *Adams* until discovery in *Webb* was completely resolved (despite this case involving far more parties and three men's deaths, and that Plaintiffs had requested *Adams* depositions as early as 2014 before the stay).[61]

---

[60] Ex. 19, p. 5, Appx. 156.

[61] *See* Ex. 15, Email from M. Kauff to S. Medlock (Mar 14, 2014), Appx. 136; Ex. 23, Letter from K. Matlock (Dec. 13, 2016), Appx. 175.

In November and December 2016, as Plaintiffs' counsel requested deposition dates and were rebuffed, Gillam shredded more responsive and relevant documents.[62]

TDCJ's counsel alleges they learned for the first time that the documents at issue were destroyed on May 18, 2017.[63] Plaintiffs were *not* alerted at that time.

Instead, Warden Miller's deposition was taken on May 25, 2017 while Plaintiffs' counsel remained in the dark.[64] Warden Goings' deposition was taken the next day.[65]

Expert designations and reports were served on June 19, 2017.

On July 24, 2017, for the first time, Defendants' counsel notified Plaintiffs about the destroyed documents.[66]

On September 7, 2017, TDCJ provided Plaintiffs with a redacted list from the risk manager indicating what documents were destroyed. The un-redacted log was provided on September 21, 2017.[68]

On October 9, 2017, TDCJ and the prison system employees (including Miller and Goings) moved for summary judgment. Doc. 433. Plaintiffs' response is due December 15, 2017. Doc. 469.

---

[62] Ex. 19, pp. 7–9, Appx. 157–159.

[63] Ex. 26, Appx. 191.

[64] Ex. 47, Appx. 430.

[65] Ex. 48, Appx. 440.

[66] Ex. 25, Letter from M. Greer (July 24, 2017), Appx. 188.

[68] Ex. 19, Appx. 151.

Missildine and Gillam were deposed on December 5, 2017. Incredibly, until he was assigned conflict counsel for his deposition, no one ever told Gillam he had done anything wrong.[69] TDCJ never disciplined or retrained him.[70]

## B. The Documents that Defendants TDCJ and Goings Destroyed

TDCJ's document destruction log describes the relevant documents as follows:[71]

| Document | Creation Dates | Destruction Dates |
|---|---|---|
| Accident/Injury Reports | May 2001 to Dec. 2008 | Oct. 14, 2014 |
| | Jan. 2000 to Dec. 2008 | Nov. 7, 2014 |
| | Jan. 2009 to Dec. 2009 | Sept. 9, 2015 |
| | Jan. 2011 to Dec. 2011 | Jan. 8, 2017 |
| Weekly Department Inspection Records | Oct. 2007 to Sept. 2011 | Oct. 14, 2014 |
| | Oct. 2011 to Aug. 2012 | Sept. 9, 2015 |
| Inmate Requests | Nov. 2000 to Oct. 2013 | Oct. 14, 2014 |
| Monthly Executive Summaries | Sept. 2011 to Oct. 2014 | Oct. 14, 2014 |
| | Oct. 2011 to Aug. 2012 | Sept. 10, 2015 |
| | Sept. 2012 to Dec. 2013 | Dec. 2, 2016 |
| Safety Meeting Minutes | Feb. 2008 to Sept. 2011 | Oct. 14, 2014 |
| Maintenance Work Requests | Jan. 2008 to Sept. 2012 | Oct. 14, 2014 |
| Training – Initial Job Safety | Sept. 2006 to Aug. 2009 | Oct. 14, 2014 |
| | Oct. 2009 to Dec. 2009 | Sept. 9, 2015 |
| | Jan. 2011 to Dec. 2011 | Nov. 29, 2016 |
| Monthly Comprehensive Inspections | Feb. 2010 to Aug. 2011 | Oct. 14, 2014 |
| | Oct. 2011 to Aug. 2012 | Sept. 8, 2015 |
| | Nov. 2012 to Dec. 2013 | Nov. 29, 2016 |
| Risk Management Investigations | July 2001 to Sept. 2011 | Oct. 14, 2014 |
| Monthly Safety Training | Jan. 2011 to Nov. 2011 | Nov. 29, 2016 |

First, TDCJ, with Goings' approval, destroyed summary documents reflecting prisoners and officers' heat-related illnesses, officers' heat training, and inspection reports finding "corrective action" required at the Gurney Unit—many of which Goings

---

[69] Ex. 46, Deposition of T. Gillam, pp. 48–49, Appx. 345–346.

[70] *Id.*

[71] *See* Ex. 19, Appx. 151.

and Miller would have reviewed.[72] TDCJ has represented that Exhibit 12 is an exemplar of this type of report. This exemplar document summarizes "a comprehensive physical inspection of the Gurney Unit" to "validate the [prison's] compliance with existing … occupational safety and health standards," including American Correctional Association standards.[73] The document includes a table of "reportable [prisoner] injuries" and an "injury trend analysis."[74] The document's purpose was to provide the warden information the prison had about injuries so he could spot patterns and address problems.[75] The exemplar specifically shows a prisoner suffered heat exhaustion in June 2014.[76] Missildine agreed the 2014 exemplar was substantially similar to the documents he created in 2011 and 2012 and gave to Miller and Goings.[77] Indeed, the document has a signature line for the wardens.[78]

These documents were obviously important. Missildine testified he knew these documents would be relevant to claims "conditions were dangerous to inmates," and he had an obligation to preserve them.[79] Missildine agreed "it could have some" "really

---

[72] Ex. 26, Appx. 191.

[73] Ex. 33, Appx. 222.

[74] *Id.*

[75] Ex. 49, Deposition of G. Missildine, p. 131:3–9, Appx. 553.

[76] *Id.*

[77] Ex. 49, Deposition of G. Missildine, pp. 127:23–129:23, Appx. 549–551.

[78] *See also* Ex. 49, Deposition of G. Missildine, pp. 119:10–120:1, Appx. 541–542.

[79] Ex. 49, Deposition of G. Missildine, pp. 35:16–36:1, Appx. 470–471.

important information" for the lawsuit.[80] The exemplar report was not disclosed until July 19, 2017, almost two-and-a-half years after the first discovery requests, almost two months after the wardens' depositions, and a month after Plaintiffs' expert reports were served.[81] Though these documents likely show otherwise, TDCJ contends the wardens are entitled to summary judgment because they were unaware of a "pattern of violations" where inmates were injured by extreme temperatures, and because the prison complies with the ACA standards. Doc. 433, pp. 34–35, 97.

Second, TDCJ admits it destroyed records of the Gurney Unit Department Head Inspection Reports.[82] The Gurney Unit's risk manager is, at least on paper, responsible for monitoring all aspects of the prison's heat mitigation measures.[83] One of the position's functions is to ensure prison staff conduct and submit notes from a physical inspection of the prison each week. In 2011, TDCJ required daily logs of all facility deficiencies and a formal, monthly report to the warden and risk manager from these same department supervisors.[84] One May 2017 weekly inspection report was provided as

---

[80] Ex. 49, Deposition of G. Missildine, p. 118:9–18, Appx. 540.

[81] *See* Ex. 24, TDCJ *Adams* Document Index (July 19, 2017), Appx. 178.

[82] Ex. 26, Appx. 191.

[83] *See* Ex. 45, Celestine Depo., p. 117:11–22, Appx. 315 (former Hodge Unit risk manager explaining that she routinely met with the warden who would "make sure we were monitoring and had our training done"); Ex. 36, Excerpts from TDCJ Risk Management Program Manual ("On a daily basis, the following tasks shall be performed . . . Ensure that unit maintains compliance with any safety related policies, procedures, or regulations.")

[84] Ex. 35, AD-10.20, "Identifying and Reporting Facility Maintenance Requirements" (Aug. 16, 2002), p. 3, Appx. 232.

an alleged exemplar on August 30, 2017.[85] The exemplar documents includes relevant information like "are plumbing fixtures in good working order?" and "[is] initial safety training current for all [prisoners] & employees?"[86] Missildine agreed these documents would be helpful in showing if "machines are breaking down or that water is not being delivered."[87] This Court relied on similar documents in denying summary judgment to TDCJ and the warden in the related *McCollum* case. *See McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, *9 (S.D. Tex. Feb. 3, 2017) (discussing inspection logs documenting presence of ice in water). These documents are essential for Plaintiffs, the Court, and ultimately the jury to weigh the adequacy of the "mitigation measures."

TDCJ claims there is no prejudice here, because, as Gillam testified, "there's … a lot of duplicity in TDC[J]. You know, those documents are retained in other locations."[88] But TDCJ has been unable to produce any "duplicates" of what Gillam destroyed. For example, TDCJ contends that work orders would be requested in writing immediately for

---

[85] Ex. 34, Department Weekly Inspection and PPE Inventory Report (May 1, 2017), Appx. 228.

[86] TDCJ contends in its motion for summary judgment that prisoners were provided "an endless amount of tap water" "from sinks equipped with bubblers" in the dormitories, and that "[t]raining was re-emphasized on a frequent basis." Doc. 433, pp. 89, 92. The destroyed documents would confirm (or deny) if those fixtures were actually functional.

[87] Ex. 49, Deposition of G. Missildine, p. 121:5–12, Appx. 543.

[88] Ex. 46, Deposition of T. Gillam, p. 69, Appx. 362. Presumably, Gillam meant to say "duplication." *Cf.* Sigmund Freud, *An Autobiographical Study* (1925), p. 14 (*available at*: http://www.mhweb.org/mpc_course/freud.pdf) ("In the same way that psychoanalysis makes use of dream interpretation, it also profits by the study of the numerous little slips and mistakes which people make … These phenomena are not accidental, that they require more than physiological explanations, that they have a meaning and can be interpreted, and that one is justified in inferring from them the presence of restrained or repressed impulses and intentions.").

most deficiencies identified by the risk manager (allegedly mitigating the prejudice of the risk manager's destruction of records identifying deficiencies), these work orders were *also* purged without being produced to the Plaintiffs.[89] Moreover, it is obvious that many possible deficiencies, such as staff failing to provide ice water or staff lacking familiarity with the signs of heat-related illness, would not be the responsibility of the maintenance department, and thus not the subject of a "work order."[90]

Third, TDCJ admits it destroyed records of the Gurney Unit risk manager's meetings with the warden.[91] The oldest such document that was not destroyed, dated September 14, 2011 (and produced only on July 19, 2017), refers to the "extreme dry situation and high temperature," and that "all departments need to justify why not all employees are being trained."[92] As the risk manager had responsibilities for officer training, it is highly likely destroyed documents reflected conversations between the risk manager and the warden about training. Plaintiffs allege the wardens (and TDCJ executive leadership) failed to adequately train correctional officers—and Defendants

---

[89] *Compare* Ex. 43, Affidavit of Byron McMullen (Oct. 23, 2013), Appx. 303 *with* Ex. 25, Letter from M. Greer (July 24, 2017), Appx. 188. The logs of the work orders were preserved, but they only contain dates, locations, a "priority" level, and a brief description of the issue—not highly relevant details such as who made the complaint, who received notice, or how much manpower was needed to fix the problem. *Compare* Ex. 41 (work order log including Sept. 27, 2011 for "KICE-02"), Appx. 299 *with* Ex. 42 (underlying work order revealing the order was for "ice machine is not working properly"), Appx. 301. And the work orders only show what repairs were actually completed—not if the inspections identified additional items that were never repaired.

[90] *See, e.g.*, Ex. 32, Gurney Unit Executive Summary (January 2014), p. 2, Appx. 219 (directing security staff to "Keep all exits unobstructed" and "Have staff ensure that lids stay on [trash] cans at all times").

[91] Ex. 26, Appx. 191.

[92] Ex. 33, Risk Management Committee/CDSO Minutes (Sep. 14, 2011), Appx. 222.

contend there is no evidence to support this claim. *See* Doc. 433, p. 32. To the extent there is no evidence, it is likely because Defendants destroyed it.

Fourth, TDCJ admits it destroyed "inmate requests." These documents likely included complaints about hot conditions during the summers of 2011 and 2012—indeed, more than a decade of "inmate messages" were destroyed on October 14, 2014, so evidence of officials' subjective knowledge far in advance of these deaths was likely destroyed.[93] These documents frequently contain essential information—like inmate requests for medical care.[94] Gillam testified the documents he destroyed could have contained complaints like "there is not enough water" or "it's just too damn hot in here," or "guards aren't refilling the water," or that "showers [are] too hot."[95] Gillam agreed he would have thought these documents were responsive to discovery requests, if any of the lawyers had discussed the requests with him.[96]

Fifth, TDCJ destroyed "Safety Meeting Minutes."[97] TDCJ has—shockingly— represented it now cannot even determine what meetings these minutes are from, or who attended the meetings (much less what was discussed).[98]

---

[93] Ex. 19, Appx. 151.

[94] *See* Ex. 28, Webb "Inmate Request" from Hodge Unit (Sept. 2, 2009), Appx. 198 ("I'm very dehydrated (even though I'm drinking plenty of water), I'm feeling dizzy, weary, cramps, muscle spasms, I have these symptoms all day long.").

[95] Ex. 46, Deposition of T. Gillam, p. 142, Appx. 390.

[96] Ex. 46, Deposition of T. Gillam, pp. 149–150, Appx. 393–394.

[97] Ex. 19, p. 2, Appx. 152.

[98] Ex. 27, Letter from L. O'Leary (Sep. 7, 2017), Appx. 194. *Compare id. with* Ex. 33, Risk Management Committee/CDSO Minutes (Sep. 14, 2011), Appx. 218.

Finally, although defense counsel incorrectly denied this, TDCJ also destroyed maintenance work order requests.[99] By the time TDCJ asked the prison's maintenance department to turn over documents in October 2013—the month of Plaintiffs' initial requests for production, and long after the deaths, public information request, TTCA notice letter, and initial preservation email—the maintenance department had already purged its records up until September 1, 2011. Meanwhile, however, the risk manager's office still had requests to the maintenance department going back to 2008—or did, until Gillam destroyed them in October 2014.[100] Summary logs of the destroyed work orders indicate there were complaints about air conditioning in officer "pickets" from April through August 2011; air conditioning broken in the officer dining room in May, June, and August 2011; a kitchen ice machine malfunctioning in May 2011; lack of ventilation in the B Building (where Plaintiffs' decedents died); showers with water that is too hot; and showers not running for long enough.[101] The actual work order documents could have related to ice machine maintenance or fan maintenance during the summer of 2011—and they might have reflected that the warden or other TDCJ officials knew the heat was bad enough that seasoned correctional officers could not make it through a shift without the air conditioning in their pickets.

In summary, these documents are highly relevant, would likely prove elements of Plaintiffs' claims, and were destroyed.

---

[99] Ex. 19, p. 2., Appx. 152

[100] *Compare* Ex. 43, Affidavit of Byron McMullen (Oct. 23, 2013), Appx. 303 *with* Ex. 11, p. 2, Appx. 58.

[101] *See* Ex. 38–40, Excerpts from Work Order Logs, Appx. 263–297.

**III.    ARGUMENT – DESTRUCTION OF DOCUMENTS WARRANTS SANCTIONS**

### A.    Standard of Review

"Courts have a right to expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such records are collected, reviewed, and produced to the opposing party." *Quantlab Techs. Ltd. (BGI) v. Godlevsky*, No. 4:09-CV-4039, 2014 WL 651944, at *7 (S.D. Tex. Feb. 19, 2014) (Ellison, J.) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F.Supp.2d 456, 461 (S.D. N.Y. 2010), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135 (2d Cir. 2012)).

When litigants, or their attorneys, breach their duty to preserve, collect, and produce documents, the Court has inherent and explicit authority to sanction this failure. FED. R. CIV. P. 37; *see, e.g.*, *Bayoil, S.A. v. Polembros Shipping, Ltd.*, 196 F.R.D. 479, 481 (S.D. Tex. 2000) (striking personal jurisdiction defense as sanction under Court's inherent power where party deleted documents). Appellate review of sanctions is narrow because "the imposition of sanctions is often a fact-intensive inquiry, for which the trial court is given wide discretion." *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001).

### B.    Defendants had a Duty to Preserve the Destroyed Documents.

TDCJ, Miller and Goings did not preserve documents, and their attorneys did little to even look for responsive documents.

Lawyers did not speak with the risk managers—the custodians of essential documents—until long after the documents were destroyed. Lawyers did not even email

the risk managers until after document destruction began. By signing a discovery response, "an attorney or party certifies that to the best of the person's knowledge, information, and belief *after a reasonable inquiry* . . . is complete and correct as of the time it is made." FED. R. CIV. P. 26(g)(1)(A) (emphasis added). If a party acts in violation of this rule without "substantial justification," the Court may award an appropriate sanction against the party, the attorney, or both. FED. R. CIV. P. 26(g)(3). *See Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 554 (N.D. Cal. 1987) (issuing sanctions in part because party failed to disclose relevant documents) (cited approvingly in *Clearvalue, Inc. v. Pearl River Polymers, Inc.*, 242 F.R.D. 362, 375, 384 (E.D. Tex. 2007) (discovery process is an "honor system" and requires parties to produce relevant documents)); *R & R Sails Inc. v. Insurance Co. of State of PA*, 251 F.R.D. 520, 524–525 (S.D. Cal. 2008) (imposing sanctions where party failed to show it made a reasonable inquiry into the existence of relevant documents).

A "reasonable inquiry" is "the amount of examination that is reasonable under the circumstances of the case." *Holden v. Illinois Tool Works,* 429 F.Appx. 448, 452 (5th Cir. 2011). The duty under Rule 26(g) to make a "reasonable inquiry" is viewed from an objective standard. *Chapman & Cole v. Itel Container International B.V.*, 865 F.2d 676, 686 (5th Cir. 1989) (quoting advisory committee notes of Rule). Subjective bad faith is not required. *In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir. 1991). "[W]hat is reasonable is a matter for the Court to decide on the totality of the circumstances." *Chapman*, 865 F.2d at 686.

Here, the relevant documents were maintained by the Gurney Unit's risk manager. This position was responsible for inspecting conditions at the prison, reporting

deficiencies to the warden, and collecting information about injuries at the prison to the warden.[102] The destroyed documents go to the heart of these duties. Plaintiffs counsel knew these were important witnesses—before the document destruction began, Plaintiffs had already asked to depose the Gurney Unit risk manager (but were thwarted by the stay), and already deposed two risk managers at other prisons where men died of heatstroke.[103] When the document destruction began, it should have been painfully obvious to TDCJ's General Counsel and the Office of the Attorney General that the risk manager had relevant knowledge and documents.

But the lawyers never spoke with these essential employees of their clients. Missilidine testified he did not speak with an attorney from the Office of the Attorney General until 2017.[104] Gillam received an email from the General Counsel's office after he started destroying documents, but never spoke with a lawyer.[105]

Certainly, when Plaintiffs' counsel complained about substantially similar discovery conduct in *McCollum*—that the General Counsel and Office of the Attorney General had not made reasonable document inquiries—that should have triggered a conversation with these key document custodians.

Likewise, Miller and Goings knew these documents had been requested by lawyers for litigation, but did not stop the document destruction. Miller knew James' death was likely caused by extreme temperatures inside the prison, and had disciplined

---

[102] Ex. 36, Appx. 243; *see also* Ex. 50, Deposition of K. Scott as TDCJ, p. 73, Appx. 594.

[103] *See* Ex. 28, Appx. 198.

[104] Ex. 49, Deposition of Missildine, pp. 57–58, Appx. 489–490.

[105] Ex. 46, Deposition of T. Gillam, p. 82, Appx. 368.

officers for failing to timely provide him medical care in violation of TDCJ's policy to address heatstrokes.[106] Before Miller's retirement, TDCJ was sued in *McCollum*, and Plaintiffs' counsel had requested public documents related to conditions at the Gurney Unit (which included the now destroyed documents).[107] At a minimum, he should have ensured the documents were preserved.

Goings' conduct was far worse. Goings actually received two preservation letters from the TDCJ general counsel. One of the letters warned Goings of "serious consequences" if documents were destroyed.[108] But Goings repeatedly approved destruction of relevant documents. Nothing was shredded without the warden's approval.[109]

But TDCJ's conduct is unfathomable. After actually being sanctioned in a related matter, for similar conduct, TDCJ (and its attorneys) still failed to search for and preserve obviously relevant documents. TDCJ told the court in *McCollum* it acknowledged "fail[ing] to meet [discovery] obligations" and "accept[ed] responsibility for these shortcomings," while contemporaneously failing to diligently inquire about the existence of these additional documents at the Gurney Unit and stop their destruction. *See McCollum*, Doc. 183 (TDCJ Response to Motion for Sanctions) (May 30, 2014) and Ex.

---

[106] Ex. 37, pp. 6–7, Appx. 257–258.

[107] It is unclear if Miller knew about the public information request at this time. This is one of the many topics Plaintiffs' counsel would have explored with the warden if the Attorney General had informed them about the document destruction before Miller's deposition.

[108] Ex. 11, Appx. 58.

[109] Ex. 49, Deposition of G. Missildine, p. 145:10–15, Appx. 562.

11 (showing document destruction beginning October 2014). An Assistant General Counsel testified in *McCollum* in May 2014 that when Plaintiffs' counsel uncovered the failure to search for documents that "remedial measures have been taken and others will be put in effect as soon as possible."[110] To escape weightier sanctions in *McCollum*, the General Counsel described how additional retention letters were sent (likely the letter Goings received in June 2014).[111]

But these "remedial measures" described to the Court never actually happened. Instead, when TDCJ's attorneys, including the Office of the Attorney General, learned that highly relevant documents had been destroyed, they did not alert Plaintiffs' counsel, but allowed numerous depositions to take place where the destroyed documents certainly would have been discussed.

## C. Defendants Knew the Destroyed Documents were Relevant.

The multiple deaths, Public Information Act requests, statutory notice letters, the ensuing lawsuit, multiple (ineffective) preservation letters, discovery requests (which resulted in production of similar documents in related litigation), depositions of risk managers in related cases, and even a sanctions order in a related case (involving the same defense attorneys and TDCJ), were more than sufficient to alert TDCJ, Miller, Goings, and their attorneys that the Gurney Unit risk management department's documents were relevant and exceptionally important. In the related litigation, risk managers at three other TDCJ prisons were deposed (and defended by the Office of the Attorney General)—including two depositions before the destruction of the Gurney Unit

---

[110] Ex. 18, Declaration of C. Milne, p. 3, Appx. 147.

[111] Ex. 18, Declaration of C. Milne, pp. 3-4, Appx. 147–148.

documents.[112] These document requests and depositions should have merely confirmed this common sense conclusion: the department responsible for safe conditions at the prison would have documents relevant to conditions of confinement that killed Plaintiffs' decedents. But TDCJ, Goings, and their attorneys never searched for, retained, or produced the documents. Then the documents were destroyed.

Plaintiffs served their first set of requests for production in this case on September 30, 2013. All of the subsequently destroyed documents were plainly requested:

> 2. Please produce all documents, including, but not limited to internal email, inmate grievances, and correspondence from state officials, reviewed by Dennis Miller, Reginald Goings, William Stephens, Robert Eason, Rick Thaler, or Brad Livingston prior to August 5, 2012 regarding heat and/or high temperatures in TDCJ facilities.

> 4. Please produce all documents that describe, or are used in, or are otherwise related to the training of officers at the Gurney Unit related to high temperatures at the prison prior to August 5, 2012.

> 6. Please produce all current documents that describe, or are used in, or are otherwise related to the training of officers at the Gurney Unit related to high temperatures at the prison.

> 8. Please produce all documents Dennis Miller, Reginald Goings, Joe Oliver, Nancy Betts, Steven Fields, Robert Leonard, Brandon Matthews, Debra Gilmore, Sarah Raines, Danny Washington, Matthew Seda, Tully Flowers, Doris Edwards, Linda McKnight, Revoyda Dodd, Rick Thaler, William Stephens, Robert Eason, and Owen Murray reviewed at any time prior to July 23, 2011 showing any medical treatment any person (including inmates and TDCJ employees) received related to heat-related injuries sustained in TDCJ facilities.

---

[112] Roy Storie in *McCollum* at the Hutchins Unit in March 2014, and Misty Atchison in *Togonidze v. Livingston* in May 2014. Plaintiffs' counsel had also requested the deposition of the Gurney Unit risk managers before some of these documents were destroyed. Ex. 22, Email from D. James to Defense Counsel re: Adams, Martone Deposition Scheduling (Oct. 14, 2016), Appx. 169.

13.     Please provide all grievances filed by prisoners at the Gurney Unit related to heat, high temperature, or heat index from January 1, 2007 to the present.

16.     Please produce all documents related to ventilation design at the Gurney Unit, including any documents related to ventilation, air conditioning, air flow, and fan placement in inmate housing areas.

28.     Please produce the daily inspection form 10.20 for the dorms where Kenneth Wayne James, Douglas Hudson, and Rodney Adams were housed in for June 1, 2011 to September 1, 2011 and from June 1, 2012 to September 1, 2012.

30.     Please produce all documents received by the risk manager regarding "temperature related incidents," as referenced in AD 10.64, from January 1, 2001 through January 1, 2012.

32.     Please produce all documents related to the [sic] inmate heat injury at the Gurney Unit from January 1, 2001 to the present.

These requests precisely describe the destroyed documents and easily put TDCJ, Miller, and Goings on notice the destroyed documents required preservation. *See*, *e.g.*, *Brown v. Tellermate Hold. Ltd.*, No. 2:11-cv-1122, 2014 WL 2987051, *20 (S.D. Ohio, July 1, 2014) ("it cannot be a defense to spoliation that the party inadvertently failed to place a 'litigation hold' or 'off switch' on its document retention policy") (citing *Mosaid Tech., Inc. v. Samsung Elec. Co.*, 348 F.Supp.2d 332, 339 (D. N.J. 2004).

### D.     Destruction of these Documents Prejudices Plaintiffs.

Critical issues in this litigation include Miller and Goings' subjective knowledge of heat-related injuries at the Gurney Unit (TDCJ MSJ, Doc. 433, pp. 74–75, 81–82), and the implementation of TDCJ's "mitigation measures" (*id*. at pp. 75–81). These documents address both issues. The documents would likely (as similar documents did in *McCollum*) show how (or if) the mitigation measures were implemented. Even where some summary documents remain, "the notes [the spoliating party] routinely destroyed or

failed to preserve would have been the best evidence of their daily tasks," and were evidence Plaintiffs were entitled to. *Moore v. CITGO Ref. & Chem. Co.*, 735 F.3d 309, 317 (5th Cir. 2013) (affirming dismissal sanctions). As the destroyed "executive summaries" would have been reviewed by the wardens, they would also show Miller and Goings' subjective knowledge of inmate injuries and how (or if) the mitigation was actually implemented. *See supra* at pp. 15–22. These are elements of Plaintiffs' claims that Miller, Goings, and TDCJ claim there is no evidence to support, warranting summary judgment. *See*, *e.g.*, Doc. 433, pp. 72–82. Simply, the destruction of these documents "compromise[s]" Plaintiffs' "ability to present [their] case." *Quantlab*, 2014 WL 651944, *11. "The discovery that was destroyed … may have been essential to [the aggrieved party's position], and without it, [the party] is certainly disadvantaged." *Moore*, 735 F.3d at 318.

These documents are especially essential as to Goings' knowledge of the conditions at the prison when Adams died on August 3, 2012. Goings contends that, though he was appointed to serve as the warden on August 1, he did not actually begin working at the prison until August 8. Doc. 433, p. 95. As such, he claims he was unaware of the conditions at the prison he became responsible for. *Id*. These documents—which Goings approved destroying—could show otherwise.

If Goings did not see relevant documents, Miller certainly did. And Goings seriously prejudiced Plaintiffs' claims against Miller by destroying the documents.

Shredding the documents (and failing to disclose the destruction even after the Office of the Attorney General knew about it) also impaired Plaintiffs' ability to take fair depositions. Certainly, the depositions of Miller and Goings would have changed if

Plaintiffs' counsel knew these documents (at one point) existed. A total of nine depositions were taken during the period between when the Attorney General learned the documents were destroyed, and when Plaintiffs' counsel was informed of the destruction.[113]

### E. Appropriate Sanctions Include Entry of Judgment Against TDCJ, Miller, and Goings, TDCJ's Indemnification of All Other Defendants, a Spoliation Instruction, and Attorneys' Fees and Expenses.

A sanction that "simply imposes fees and expenses and orders" that proper discovery take place allows the wrongful party to get away with what it sought to achieve—obtaining an advantage over the party who was wronged. *See VirnetX Inc. v. Cisco Systems, Inc.*, 2012 WL 7997962, *5 (E.D. Tex. August 8, 2012) (Davis, J.) (awarding sanctions for wrongfully stopping a deposition). "Such a nominal sanction would not provide any deterrent effect and would not put" the aggrieved party in the position it was in prior to the wrongful acts. *Id.* This is especially true here, where 1) the documents are destroyed, and nothing can truly return Plaintiffs to the position they should otherwise be in, and 2) TDCJ was not deterred by previous sanctions (and told the Northern District it was taking ameliorative steps it did not). Absent a more meaningful sanction this time, future litigants faced in a similar situation may choose to act wrongfully because the benefits outweigh the costs. *Id.* After all, TDCJ already did.

To begin, a monetary award of Plaintiffs' attorneys' fees and expenses is appropriate. Plaintiffs' counsel needed to prepare this motion. Wardens Miller and Goings will have to be deposed a second time. The two risk managers needed to be

---

[113] Depositions of Robert Leonard (May 18, 2017), Brandon Matthews (May 18, 2017), Revoyda Dodd (May 19, 2017), Doris Edwards (May 19, 2017), Matthew Seda (May 23, 2017), Dennis Miller (May 25, 2017), Reginald Goings (May 26, 2017), Tully Flowers (May 31, 2017), and Sarah Raines (May 31, 2017).

deposed about document retention and destruction. Several other witnesses may need to be re-deposed. These depositions may reveal further depositions are required. Paying Plaintiffs' fees and expenses for the depositions to date—nine witnesses, plus the two risk managers—is an appropriate, minimal sanction.[114]

These additional depositions may require Plaintiffs to revise their experts' reports. If so, the associated expenses should also be borne by TDCJ, Goings, and Miller.

But even these penalties are insufficient where the documents cannot be eventually produced, and TDCJ has already been sanctioned for similar conduct in related litigation. Plaintiffs do not want to continually depose and re-depose Defendants. Delay benefits Defendants.[115] Therefore, a stiffer penalty is required for this second offense. In *Quantlab*, this Court found similarly critical documents had been destroyed, and determined a spoliation instruction was an appropriate sanction. *Quantlab*, 2014 WL 651944, *25. The *Quantlab* defendants, however, were first offenders. Not so for TDCJ. If a purpose of sanctions is to "deter those who might be tempted to such conduct" as well as restore the aggrieved party, TDCJ has demonstrated it was not previously deterred. *Quantlab*, 2014 WL 651944, *8 (citing *Moore*, 735 F.3d at 315–16). The risk manager even testified he understood that destruction of documents prejudiced an opposing party's ability to prove their claims.[116]

---

[114] As this issue will likely involve additional attorney labor before it is resolved, the Plaintiffs request to submit an appropriate fee application after the Court decides this issue.

[115] This is not hypothetical. Two plaintiffs died while this litigation was pending—Mary Lou James (mother of Kenneth James), and Wanda Adams (mother of Rodney Adams). The State of Texas is immortal. Human beings are not.

[116] Ex. 49, Deposition of G. Missildine, p. 59:5–24, Appx. 491.

Instead, as the Fifth Circuit affirmed in *Moore*, appropriate sanctions here include entering judgment against Miller, Goings, and TDCJ. In *Moore*, the plaintiffs failed to search for, retain, and produce relevant emails. *Moore*, 735 F.3d at 314–15. After repeatedly failing to comply with discovery obligations, the district court sanctioned the plaintiffs by dismissing their claims. The Fifth Circuit affirmed: though "dismissal is a severe sanction" it is appropriate where necessary to "penalize those whose conduct may be deemed to warrant such a sanction" and to "deter those who might be tempted to such conduct." *Id*. at 315-16 (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)). *See also Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995) (affirming dismissal sanction). The Court should do the same here as to TDCJ, Miller, and Goings, and proceed to a trial on the amount of Plaintiffs' damages.

The civil "death penalty" has been levied for less severe prejudice. *See Frost v. Ft. Worth Indep. Sch. Dist.*, 5 F.3d 1495 (5th Cir. 1993) (affirming dismissal of pro se party's claims when he failed to attend his deposition); *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976) (affirming entry of default judgment sanction for failure to comply with discovery obligations and previous court orders, though no documents were destroyed); *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1305 (5th Cir. 1988) (affirming entry to default judgment sanctions); *Bratka v. Anheuser-Busch, Inc.*, 164 F.R.D. 448, 456 (S.D. Ohio Dec. 11, 1995) (entering judgment on liability, and reserving for trial the amount of plaintiff's damages); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 514 (N.D. Ohio, Mar. 11, 2013) (granting dismissal sanction).[117]

---

[117] In *Bratka*, defense counsel obstructed and delayed discovery for years, but the relevant evidence was eventually produced. Though the *Bratka* plaintiff was significantly

"An award of fees and expenses alone would not be a sufficient sanction" where "[s]uch a sanction was imposed at an earlier stage … but apparently failed to impress the defendant with the seriousness of its responsibilities." *Bratka*, 164 F.R.D. at 463. Here, TDCJ (and its counsel) was not previously deterred by the sanctions order in *McCollum*. Thus, tougher measures are required here.

Furthermore, TDCJ (and its counsel) is the worst actor here. TDCJ and its lawyers failed to comply with its discovery obligations (resulting in the destruction of documents), then concealed the misconduct for months as Plaintiffs' counsel deposed multiple witnesses. No lawyer—no one from the Office of the Attorney General, no one from the TDCJ Office of General Counsel—ever had a conversation with either risk manager about retaining documents before they were destroyed.[118] No lawyer with the Office of the Attorney General spoke with either risk manager until 2017.[119] In *McCollum*, for virtually identical conduct, Judge Toliver abstained from ordering entry of judgment only because TDCJ described "act[ing] with reasonable diligence in remedying the discovery violations"—though staying her hand was "a close call." *McCollum*, No. 3:12-cv-02037-L, Doc. 219, p. 24 (N.D. Tex. Jan. 26, 2015). Now, TDCJ is a repeat offender, cannot remedy the prejudice, did not follow through on its promises to the Court in *McCollum*, and deliberately obscured that the document destruction had even

---

prejudiced, he eventually got the evidence he needed. Here, that is impossible, because the evidence was destroyed.

[118] Ex. 49, Deposition of G. Missildine, p. 41:5–16, Appx. 475.

[119] Ex. 49, Deposition of G. Missildine, p. 57:21–22, Appx. 489 (spoke with lead counsel Matt Greer); Ex. 46, Deposition of T. Gillam, pp. 13–14, 17, Appx. 328–329, 333 (spoke with former counsel Dan DiLizia).

occurred during the critical period where numerous depositions (including of the wardens) was occurring.

As this Court recognized in *QuantLab*, a "termination sanction" is justified "where a party has … intentionally destroy[ed] evidence by burning [or] shredding." *QuantLab Tech. Ltd. v. Godlevsky*, 2014 WL 651944, *9 (S.D. Tex. Feb. 19, 2014). The factors to consider are: (1) the discovery abuse resulting from "willfulness or bad faith accompanied by a clear record of contumacious conduct," (2) "violation of the discovery order must be attributable to the client instead of the attorney" and cause "substantial[] prejudice," and (3) "a less drastic sanction would not substantially achieve the desired deterrent effect." *QuantLab*, 2014 WL 651944, *9 (S.D. Tex. Feb. 19, 2014) (citing *Moore*, 735 F.3d at 316).

TDCJ, Miller, Goings, and the lawyers' conduct justifies this serious penalty here.

First, TDCJ and Goings acted in bad faith. "Bad faith" may be inferred when "a party purposely loses or destroyed relevant evidence." *QuantLab*, 014 WL 651944, *9 (S.D. Tex. Feb. 19, 2014) (citing *Managed Care Sol'ns Inc. v. Essent Healthcare*, 736 F.Supp.2d 1317, 1322 (S.D. Fla. 2010). There is no dispute the documents were intentionally, not accidentally, destroyed. Goings repeatedly received the document destruction logs, and signed off on them. He had been warned about "serious consequences" of document destruction, but did it anyway.[120]

---

[120] *See* Ex. 11, Appx. 58. Goings may claim the Plaintiffs' liability case against him is too weak to justify such serious sanctions, as he only became the prison's warden on August 1, 2012 (just two days before Adams' death). But letting him off would provide an immense benefit to Miller and TDCJ. Miller had retired by the time the documents were destroyed, after working at the prison since 2007. The documents would be most valuable in Plaintiffs' liability case against Miller. Goings' document destruction benefitted his colleague. Goings needs to pay the price to make the Plaintiffs whole.

A "bad faith" finding is also justified by TDCJ's repeated failures to conduct simple discovery after its misrepresentations in *McCollum*. When TDCJ got caught in *McCollum*, its lawyers attempted to fall on the sword—pleading ignorance of the agency's scope and operations, and that agency policies had changed to make sure this never happened again.[121] Judge Toliver was "incredulous" and thought these claims "ludicrous." *McCollum*, Doc. 219 (N.D. Tex.). She was right. Months after the lawyers' *McCollum* declarations were signed, more documents were destroyed because the lawyers never asked for them or spoke to the custodians.

Second, these failures are attributable to the client. Goings approved the document destruction after being informed about his duties to preserve documents. TDCJ's in-house lawyers were responsible for gathering responsive documents and the bulk of the discovery responses.[122] When in-house lawyers commit sanctionable conduct, the client should pay the price. *See Bratka*, 164 F.R.D. at 461 (entering termination sanction when corporate general counsel was "grossly deficient in his efforts to obtain all the documents responsive to plaintiff's discovery requests").

Third, lesser sanctions, like a spoliation instruction, cannot truly cure the prejudice in this case. As Defendants repeatedly note, the "deliberate indifference" burden in this § 1983 case is very high. Doc. 433, p. 140 ("*an extremely high burden*") (emphasis in TDCJ's brief). It is hard not to conclude every little bit would help Plaintiffs clear this hurdle—and the destroyed documents were not just a "little bit." This Court

---

[121] *See* Ex. 18, Declaration of C. Milne, p. 3, Appx. 147.

[122] *Compare* Ex. 18, Declaration of C. Milne, Appx. 145 *with McCollum*, Doc. 183.1 (Declaration of Assistant Attorney General B. Garcia).

actually relied on similar documents to deny summary judgment in *McCollum*. Thus, these documents had immense value to the Plaintiffs.

Though far too lenient given the history of this case, the only potentially lesser appropriate sanction is denying Miller, Goings, and TDCJ's summary judgment motions and issuing a spoliation instruction at trial. *See Quantlab*, 2014 WL 651944, at *25-26. The Court should instruct the jury that: 1) TDCJ, Miller, and Goings knew about a pattern of heat-related injuries at the prison that began in at least 2001;[123] 2) TDCJ, Miller, and Goings knew "mitigation" measures discussed in the inspection logs were not in place (such as access to cold drinking water, showers, fans, and ventilation); and 3) that TDCJ, Miller, and Goings failed to prevent the destruction of relevant evidence that would benefit the Plaintiffs. *See Apple, Inc. v. Samsung Elec. Co. Ltd.*, 888 F.Supp.2d 976, 995 (N.D. Cal. 2012).

Ultimately, however, these discovery abuses were perpetrated by the State of Texas. The Office of the Attorney General[124] and TDCJ General Counsel did not even talk to the key records custodians for years, even while telling the Northern District they were trying to mitigate their conduct in *McCollum*. But because of sovereign immunity principles, TDCJ itself is immune from § 1983 liability.[125] Given these circumstances, another appropriate sanction is taking this tool away. The Court should order TDCJ to

---

[123] The earliest year documents were destroyed from after Defendants anticipated litigation.

[124] The OAG's Law Enforcement Defense Division is captured counsel for TDCJ. The division's lawyers primarily defend the agency.

[125] Should spoliation instructions contribute to a judgment being entered against any of the individual defendants, the individuals likely cannot sue their lawyers for malpractice, because those claims would also be barred by sovereign immunity.

indemnify any officer found liable in this litigation as a sanction under its inherent power. This would be an effective way to ensure the agency never does this again.

Finally, the Court should conduct a show cause hearing to determine how this gross failure to comply with basic discovery obligations took place. Plaintiffs cannot unravel this mess themselves—TDCJ, Miller, and Goings have been represented by fourteen lawyers who appeared in this litigation (not counting high-level supervisors at the Office of the Attorney General, such as now-Gov. Greg Abbott and Ken Paxton), and not counting the agency's in-house counsel. But until 2017, none of these attorneys spoke with these critical witnesses who counsel knew were responsible for these essential documents. Policing fellow members of the bar is distasteful, in part because attorneys' obligations as professionals should make it unnecessary.[126] Clients' legitimate expectation of privilege further complicates resolving these issues without the presence of the Court. But here there is "something rotten in the state of [Texas],"[127] and someone needs to explain how this happened.[128] Again.

## IV.  CONCLUSION

Plaintiffs recognize "sanctions should be no more severe than necessary." *Quantlab*, 2014 WL 651944, at *10. But TDCJ's repeated conduct leaves them no choice but to ask for heavy penalties. TDCJ should be ordered to pay Plaintiffs' attorneys' fees and costs associated with assessing the extent of the prejudice (and re-deposing necessary

---

[126] And, unfortunately, this is unlikely to be the last motion for sanctions in this case. *See supra* at n.2.

[127] WILLIAM SHAKESPEARE, HAMLET, act 1, sc. 4.

[128] For the least of reasons, to make sure it has not happened in any of the other companion cases.

witnesses). Judgment should be entered against TDCJ, Goings, and Miller. TDCJ should be ordered to indemnify any official found liable in this action. And the Court should schedule a show cause hearing to assess how this happened.

Dated: December 13, 2017.

Respectfully submitted,

Edwards Law
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
    Tel.    512-623-7727
    Fax.    512-623-7729

By    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572

Wallis Nader
Texas Bar No. 24092884
Southern District No. 2609150
TEXAS CIVIL RIGHTS PROJECT—
HOUSTON
2006 Wheeler Ave
Houston, TX 77004
    Tel.    (832) 767-3650
    Fax.    (832) 554-9981

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF CONFERENCE

I certify that I conferred by telephone on December 13, 2017 with Leah O'Leary, counsel for the TDCJ Defendants, and Defendants are opposed to the relief requested in this motion at this time.

By    /s/ Jeff Edwards
        JEFF EDWARDS

## CERTIFICATE OF SERVICE

By my signature, I hereby certify that the foregoing document has been served on all counsel of record via the Court's ECF filing system.

By    /s/ Jeff Edwards
        JEFF EDWARDS